## FIRST NAT. BANK OF CHATTANOOGA v. PHŒNIX MUT. LIFE INS. CO.

### No. 1760.

District Court, E. D. Tennessee.

Aug. 1, 1931.

Williams & Frierson, of Chattanooga, Tenn., for plaintiff.

Miller, Miller & Martin, of Chattanooga, Tenn., for defendant.

TAYLOR, District Judge.

The complainant was as trustee designated sole beneficiary in three policies of insurance aggregating $25,000 payable in the event of death of the insured, and each policy contained a provision that in the event of accidental death not excepted therein the amount payable would be double. Defendant has paid $25,000 to the beneficiary trustee, and this suit is for the additional $25,000. The complainant insists insured met his death accidentally and under circumstances entitling a recovery. The suit was instituted in the chancery court for Hamilton county, and removed to the United States District Court by the defendant upon the ground of diversity of citizenship. The cause was here transferred to the law docket and declaration thereafter filed.

The parties have stipulated with reference to the facts involved and have waived a jury. Exhaustive briefs have been filed and the case ably argued and is now before me for decision of the sole question whether insured's death resulted from participation in an aeronautic operation.

The facts by stipulation are that the three policies referred to in the declaration were issued by the defendant in the year 1924, and that policy No. 456,615, filed as an exhibit to the bill filed in the chancery court of Hamilton county, is made a part

of the evidence, and that, except as to date and amount, the other policies are identical with it in language; that the insured died February 24, 1930, when all of the policies were in force and effect; that $25,000 has been paid, which, together with a small amount representing accrued dividends, also paid, is in full satisfaction of liability under the policies unless upon the facts set forth in the stipulation there is additional liability under the double indemnity provisions of said policies. Defendant obligated itself to pay plaintiff as trustee double indemnity or additional sums aggregating $25,000 in the event insured's death should be caused by accidental means subject to the following provisions: "(b). This Double Indemnity Benefit shall not be payable if the death of the insured resulted directly or indirectly, wholly or partly, from physical or mental infirmity, ptomaines, bacterial infections (except pyogenic infections which shall occur simultaneously with and through accidental cut or wound), or from any other kind of disease; from suicide while sane or insane; from any violation of law by the insured; from bodily injuries received while the insured is engaged in military or naval service; from participation in aeronautic or submarine operations; or from bodily injuries received outside of the continental United States and the waters within three miles of its coast line, and due directly or indirectly to a state of warfare."

Insured's death was accidental within the meaning of the policies, unless it resulted directly or indirectly, wholly or partly, from participation in aeronautic operation within the meaning of the above provision; that insured was accidentally killed under the following circumstances: After receiving notice in Chattanooga that his wife had been seriously injured in Florida, and in order to reach her bedside, he started from Chattanooga to Florida in an aeroplane piloted by a licensed pilot, when near Marietta, Ga., the plane fell to the ground with such violence that he was killed; that he was not a pilot, and from the time the plane left Chattanooga until it fell was riding in the plane, but taking no part in operating the mechanical devices by which its movements were controlled, these being under the exclusive control of the licensed pilot; that the plane in which insured was riding at his death belonged to Southern Flyers, Inc., a Tennessee corporation, with its office and all of its planes located at Chattanooga; that the corporation had been organized in August, 1929, to deal in and operate aeroplanes; that upon organization it purchased a plane and from time to time purchased others; that it had sold two planes and was negotiating for other sales, and that its incomes were (1) profit from the sale of aeroplanes; (2) the operation of planes for two purposes: (a) Taking passengers for sightseeing trips around Chattanooga and for business or pleasure trips to distant places; and (b) instructing aviators in the art of flying, using the company's planes for that purpose; that the corporation did not operate planes on fixed schedules and was not a common carrier; that each trip was the subject of a specific price made for that trip, depending upon the circumstances thereof; that upon organization of the company insured took 50 shares of its stock, and R. H. Hart, Jr., 25 shares of par value $100, and that some three months later, when the need for more capital arose, insured took and paid for 30 additional shares, and at his death owned 80 shares of the outstanding 105 shares, the remaining 25 being owned by Hart; the incorporators and first directors were insured, Hart, and R. P. Frierson, the latter owning no stock at any time; during the entire existence of the corporation insured was its president and actively engaged in managing and directing its affairs, and while he had other interests was not engaged in any other business; that Hart and insured were in full charge of the sales department; when the company was organized none of the incorporators was a pilot, but the company had in its employ Ringel, a licensed and experienced pilot, well known as a "stunt flyer," who had on numerous occasions done acrobatics on or from planes in the air; he was employed to handle and fly the company's planes, both for the purpose of carrying passengers and instructing students, receiving as his compensation one-third of the gross receipts from both passengers and students; that in 1930 Ringel was elected a director of the company in place of Frierson, and entered into a contract to take effect March 1, 1930, by which he was to be paid a salary of $200 per month, and in addition $4 per hour for time spent in the air while carrying passengers or instructing students; this contract never took effect because both insured and Ringel were killed; it was understood between Hart and insured, they owning all of the stock, that either might use company planes for personal pleasure or business trips without paying for such use, but either so using such planes would pay for the gasoline and oil and compensate Ringel for such services;

that, at the time of insured's death, Hart had not alone thus used any of the company's planes, but insured had used them for trips of his own personal purposes as well as company business, and in the interest of aviation, and on one of such trips Hart had accompanied him; such trips were to Knoxville, Nashville, Murphreesboro and Shelbyville, Tenn., and St. Louis, Mo., and Cleveland, Ohio; the trip to Shelbyville was in the interest of establishing a flying field; shortly before insured died he took a trip to St. Louis with Hart and Ringel for the purpose of attending an exposition of flying machines; that on one occasion insured used a company plane piloted by Ringel, taking Dr. Lyle West to Cleveland, Ohio, where they met insured's wife, the three returning to Chattanooga in the plane piloted by Ringel; on another occasion, when insured was returning from New York by railroad train he had Ringel take one of the company's planes to Bristol, where insured left the train and continued the trip to Chattanooga in the plane piloted by Ringel; that these trips to and from Cleveland and from Bristol and some of the other trips were made for purely personal purposes, and had no connection with the company's business; on such trips, business and personal, insured had spent not less than 50 hours in the air, but merely rode in the plane which was piloted by the licensed pilot; both insured and Hart had obtained permits to become student aviators, and had received some instructions from Ringel in the customary way, that is, the student riding in a plane having dual controls, and the instructor permitting the student under his direction to operate the plane by means of the controlling devices at which the student was seated; after having had 10 hours of this instruction, if the student can stand certain other tests, he is eligible to receive a student's license authorizing him, as a student, to take up a plane by himself; after the student has had 10 hours in the air under this license, he is eligible to receive a license as a private pilot; before he is eligible to receive a license as a commercial pilot he must have had at least 50 hours in the air as a student and private pilot; at the time of insured's death he had had about 2 hours of instructions in the air; on occasion of the fatal flight, after receiving news of his wife's injury on the night of February 23, 1930, insured communicated with Dr. West, who agreed to accompany him to Florida; he then telephoned the father of Hart (who was in Atlanta) to notify Hart that he was going to Florida; insured called Ringel, advised him of his wife's injury, and requested Ringel to be prepared to leave Chattanooga early the next morning and pilot insured and Dr. West to Florida; Ringel replied that it was then raining and he could not promise anything, and suggested that insured go by automobile immediately; insured said he would wait until morning and see how the weather looked; insured, West, and Ringel met at the hangar at 8:30 the following morning when the plane was fueled with gasoline and oil purchased by insured personally; according to the practice, insured would not have been expected to make any payment or allowance to the corporation for the use of the plane on this trip, but as to whether he compensated Ringel or was to have compensated him is not known; it was very foggy—no visibility beyond 300 feet; insured suggested that the weather might not be as bad as it looked, and at Ringel's suggestion they circled the plane around the field, but persons on the field could hardly see it make its landing; Ringel said it would be foolish to attempt the trip, and again told insured it might be better for him to go in his automobile, because if the weather was as bad south as it was at the field, and he should have to land, insured would then have to take a train and would lose more time than if he started immediately by automobile; insured agreed that he would do this if the weather did not get better soon; they waited another half hour and called the weather bureau and were advised the indications were for fair weather with no rain in the extreme south, except at New Orleans; insured said he thought it was beginning to look brighter toward Atlanta, and he wanted to go; Ringel said it was against his better judgment as a pilot, but that he knew how insured felt about getting to his wife, and that if insured insisted he would go, whereupon insured asked Dr. West what he had to say about going, and West answered that it was up to the insured, but that he, West, thought they should not take the risk if Ringel did not think it safe; insured decided to go, and they started; when about 100 miles of the trip had been made conditions were still such that it was decided to land at the Marietta, Ga., airport, and, in attempting to make the landing, the plane struck the ground and was wrecked. The stipulation further contains a letter written by the defendant's second vice president and counsel declining to pay the double indemnity for the reason, as he insists,

"the exception noted above in our double indemnity provision was intended to cover such a case and to relieve this Company from liability for double indemnity benefits where the death of the insured resulted from riding in an aeroplane."

No case has been cited, nor have I found one, construing the exact exception involved here, nor has any case been cited or examined considering the question of whether anything short of manual performance might constitute participation in an "aeronautic operation," giving that phrase the construction urged by the plaintiff.

Plaintiff insists the language used in the exception was a departure from the language usually found in policies issued at that time, and in the departure sees an intent on the part of the insurer to accept liability for accidental death where the insured.is a passenger only, that is, a passenger who does not participate in any mechanical operation essential to navigating the air or in any physical act so intended. The defendant takes the position that there was no such departure, that is, no departure liberalizing the contract, but that the word "engaging" commonly used in policies was omitted and the word "participation," a stronger word from the insured's standpoint, used to except liability in cases where the insured met death accidentally while a casual operator, mere passenger, or otherwise in any way participating in aeronautics; that "aeronautic operations" adds nothing to nor takes anything from the word "aeronautics" or the word "aviation"; that the .only significance in the change of commonly used excepting provisions was that it removed the phrase "engaged in," which phrase had usually been construed to except casual passengers, and had left open the question of indemnity as to casual pilots who were not engaged vocationally in aviation or aeronautics.

If the above-quoted provision of the policy is ambiguous, that is, so worded as that ordinarily intelligent persons would reasonably differ as to its meaning, the well-recognized rule of construction would require the adoption of that reasonable. version of the words employed most or more favorable to the insured.

If the words employed, giving them their usual and ordinary meaning, convey but a single reasonable idea or meaning, courts do not have the power to seek out a strained, unnatural or unusual meaning in order to attain a construction under which indemnity would attach. I think this is well settled.

The state of aviation or aeronautics in the year 1924 and the state of judicial opinion then are the criteria for judging whether the words here involved are susceptible of two or more reasonable constructions.

The state of the art then was such, if in fact it is not now, so, that navigation of the air constituted an unusual risk to pilot and passenger alike.

The cases then dealt with participating and engaging in aeronautics or aviation, or with cases in which insured met accidental death while in, on or falling from or with devices for aerial navigation, or handling same, and with similar provisions.

"Participating" was usually given . its commonly accepted meaning,. that is, sharing in without the implication of physical contribution, and "engaging" was ordinarily held to partake of the idea of frequency or continuity with perhaps sometimes the suggestion of a vocational connection, but the idea of physical manipulation of flying instrumentalities did not enter in as the ratio decidendi. So when these policies were written, two forms of exclusion provisions had been before the courts, one of which had been almost uniformly held to exclude all who rode in flying machines, and the other clearly excluded only those who had occupational connection therewith and left somewhat beclouded the field when insured privately owned and operated pleasure craft.

In this state of aeronautics and decision the defendant adopted the exception which contained the word "participation," uniformly held to exclude the idea of continuity or vocational significance, and rejected the words "aeronautics" or "aviation" having a settled meaning and chose the phrase "aeronautic operation" and, plaintiff insists, thereby either intended to liberalize the indemnity so as to include the passenger (excluded by these policies excepting death resulting from participation in aviation or aeronautics) and yet exclude all those who in any manner participated in the operation of the instrumentality. If the words chosen are susceptible of that reasonable construction, the indemnity must attach.

The whole question turns on whether there is difference between "aeronautics" and "aviation" and "aeronautic operation" as the phrase is used in the policies.

"Operation" is defined as "some special kind of activity; manner of action"—Funk & Wagnalls Standard Dictionary; "a particular kind of activity; a mode of action"—the Oxford Dictionary. Another definition

is "Act, process or effect of operating; a doing or performing action, work; working, agency, exertion of power or influence; method, as way of operating or working; mode of action or form of activity."

The various shades of meaning entering into the dictionary definitions make them of little value.

I am of opinion the word "operations" used in the contract in connection with "aeronautic and submarine" excludes as unreasonable the construction of physical participation in the operation of the instrumentality. Can it be conceived the insurer intended to insure a passenger on a submarine ship unless the passenger physically participated in operation? Such a situation could hardly be anticipated and certainly not made the subject of assumption of liability.

I cannot see ambiguity in this provision and must decide that there is no liability for double indemnity, even assuming the insured to have been a casual passenger when he met death.

Under the strained construction sought by plaintiff, there would be no liability if insured was, at the time of the fatal crash, participating in the operation of the aeroplane. One may participate in the operation of an aeroplane and yet perform no act required to set or keep it in motion.

Under plaintiff's construction and reasoning there would be liability in cases where the passenger directed movement by movement, the conduct of the pilot, or where the passenger engaged in the business of navigating the air, so long as his connection with such business was short of actual physical participation in operation. Nothing short of this insistence would include the facts of the present case. To participate in operating aeronautic devices, one need not participate in the sense of performing acts incident to setting or keeping them in motion. I am of opinion one who directs when the flight is to be made and who interposes his judgment as a finality with reference to conditions which indicate that a flight may be safely made or otherwise, that is, judges as to the fitness of the weather, a most important element entering into aviation, may be said to have participated in operation. Could it be reasonably urged that one sitting beside the pilot of a flying device and directing the altitude to be attained and directing whether a storm be circumvented or encountered, and deciding whether the plane descend or stay aloft when the safety of either course

is in question, would not be participating in the operation of the device?

I think there can be no doubt that such participation is no less in operation than in aeronautics or aviation.

In the case of Gits v. New York Life Ins. Co. (C. C. A.) 32 F.(2d) 7, 9, relied upon by plaintiff, the language used suggests the court's inclination toward plaintiff's insistence here. It will be seen by a careful examination of the opinion that the decision turned upon the word "engaging," though the court said: "The very words suggest to us the quality of continuity and frequency, as well as some degree of participation in the use of the instrumentality." The Jackson Case (the Masonic Accident Ins. Co. v. Leona Jackson) 200 Ind. 472, 164 N. E. 628, 61 A. L. R. 840, reviews the authorities and is approved in the Gits Case. With the Gits Case I cannot agree, if it must be understood as deciding the question here in favor of plaintiff's insistence.

The question of penalty need not be discussed.

A judgment for defendant may be agreed upon or prepared and lodged with the clerk under the rules of the court.